**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALABAMA POWER COMPANY<br>600 18th St. N.<br>Birmingham, AL 35203<br><br>GEORGIA POWER COMPANY<br>241 Ralph McGill Blvd. NE<br>Atlanta, GA 30308-3374<br><br>and<br><br>MISSISSIPPI POWER COMPANY<br>2992 W. Beach Blvd.<br>Gulfport, MS 39501<br><br>                   Plaintiffs,<br><br>       v.<br><br>UNION PACIFIC RAILROAD COMPANY<br>1400 Douglas Street<br>Omaha, NE 68179<br><br>BNSF RAILWAY COMPANY<br>2650 Lou Menk Drive<br>Fort Worth, TX 76131<br><br>CSX TRANSPORTATION, INC.<br>500 Water Street<br>Jacksonville, FL 32202<br><br>and<br><br>NORFOLK SOUTHERN RAILWAY<br>COMPANY<br>Three Commercial Place<br>Norfolk, VA 23510<br><br>                  Defendants. | Civil Action No.<br><br>Judge<br><br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiffs Alabama Power Company ("APC"), Georgia Power Company ("GPC"), and Mississippi Power Company ("MPC") (collectively "Plaintiffs"), all subsidiaries of The Southern Company, bring this action under the antitrust laws of the United States against defendants Union Pacific Railroad Company ("UP"), BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (collectively, "Defendants" or "Defendant Railroads"). Plaintiffs allege as follows:

## INTRODUCTION

1. This is an action under the Sherman and Clayton Acts for compensatory damages, treble damages, and other relief against Defendants, the four largest Class I railroads in the United States, jointly and severally, for illegally conspiring to use rail fuel surcharges as a mechanism to fix, raise, maintain, and stabilize prices of rail freight transportation services sold in the United States. Plaintiffs are electric utilities located in the southeastern United States that operate coal-burning electric generation plants that power homes, businesses, hospitals, and schools. To operate these plants, the Plaintiffs directly purchased from one or more of the Defendants rate-unregulated[1] rail freight transportation services for the huge volumes of coal and other commodities often shipped long distances. Because of the conspiracy and its imposition of the mechanism of fuel surcharges to raise artificially shipping prices, the Plaintiff utilities paid hundreds of millions of dollars in overcharges. The Plaintiff utilities purchased transportation

---

[1] As used in this Complaint, "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

services through long-term contracts, meaning that they often paid excessive rates through the duration of those agreements.

2.      Prior to deregulation of the railroad industry that began in the early 1980s with the Staggers Rail Act of 1980 ("Staggers Act"), rail freight was transported by numerous federally-regulated railroads in accordance with rates published in tariffs filed with the Interstate Commerce Commission ("ICC").  During this period, Defendants could apply to the ICC for across-the-board rate increases.  But after the Staggers Act and deregulation, railroad rates for shippers became subject to negotiation.  By the early 2000s, the Defendant railroads were unable to obtain unilaterally higher rates from their customers to increase revenues and no longer had the means to institute across-the-board rate increases.

3.      Given these dynamics, the railroads concluded that they could increase overall prices through the mechanism of a fuel surcharge applied to as many shipments and customers as possible.  They also determined that joint action was necessary to implement successfully this scheme.  Absent coordination, industry-wide agreement, and a uniform front, a railroad seeking to impose a fuel surcharge more aggressively than its competitors would risk losing business to another railroad that imposed no fuel surcharge at all, applied a less onerous fuel surcharge, or had more flexible fuel surcharge policies.  Uniformity also ensured the Defendants could justify their fuel surcharges as "standard" in the industry in response to objections by rail customers.

4.      The railroad industry by the early 2000s was also highly concentrated.  Before the Staggers Act, approximately 35 Class I railroads operated within the United States.  ("Class I" railroads are the largest nationwide freight railroads in the United States by annual revenues.)  After the Staggers Act, the freight rail industry experienced dramatic consolidation.  By the early 2000s, there were only seven Class I railroads operating in the United States.  Defendants were at

that time, and are today, by far the largest of the remaining Class I railroads, which collect about 90% of all rail freight revenue in the United States.

5.     The highly concentrated nature of the freight rail industry made it possible for Defendants in 2003 to conspire and agree to impose an artificially high surcharge structure, purportedly to cover fuel costs, as the means to raise rates across the board and thereby increase profits.  Prior to the unlawful agreement, Defendants had individually experimented with fuel surcharges by establishing public fuel surcharge programs for certain traffic.  However, these provisions were not applicable to contracts unless specifically incorporated or referenced in the contract itself.  Therefore, the contract traffic at issue in this case was almost never subject to a fuel surcharge provision before the unlawful agreement.  Even if a fuel surcharge provision applied to traffic, the pre-agreement fuel surcharge programs were not necessarily triggered or enforced.  Moreover, these programs relied upon a wide variety of methods and formulas – many of which were not percentage-based – in contrast to the later unlawful agreement which resulted in widespread application of a percentage-based fuel surcharge to the base rates for contract traffic.

6.     Beginning in or around the start of 2003, the Defendants agreed to coordinate their fuel surcharges and base them not on the actual amount of fuel usage or cost, but instead on a percentage of the base rate charged to the shipper, with that percentage determined and applied in addition to other rate adjustment formulas or methods that had customarily addressed changes in fuel prices.  The President and CEO of UP stated in a July 2007 interview that the new rail fuel surcharges as applied to rail freight were "really unique to the railroad industry.  Three, four years ago they were really non-existent."

7.      The surcharge mechanism also had an aggressive triggering point, or "strike price," which ensured that fuel surcharges would virtually always be applied based upon fuel prices at the time of contracting. The concept of fuel surcharges also was intended to disguise their intended effect and provided the railroad Defendants a pretext for the additional charges.

8.      Defendants' conspiracy occurred through, and was facilitated by, an extraordinary number of communications, conversations, and meetings, often between and among high-level railroad executives.  These communications, and the Defendant Railroads' efforts to impose and enforce coordinated fuel surcharges, began at least as early as the spring of 2003.  In these communications, Defendants agreed to coordinate those fuel surcharges and apply them as widely as possible, as uniformly as possible, and to as many freight shipments as possible.  They also agreed to limit or avoid negotiating the application and terms of the surcharges.  The Defendants also discussed fuel surcharges at meetings of the Association of American Railroads ("AAR") and other industry meetings, including the National Freight Transportation Association biannual meeting.

9.      The Defendant Railroads began to implement their scheme in 2003.  By June 2003, UP, which had based its prior, published fuel surcharge program on a West Texas Intermediate Index ("WTI Index"), switched to the index that was being used by BNSF's program, the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index"). Thereafter, if the HDF Index reported a change in the average price of diesel fuel above a set "trigger price," BNSF and UP would each adjust their fuel surcharge percentage in a similar increment.  Crucially, BNSF and UP began incorporating or referencing their published fuel surcharge programs into contracts as broadly as possible or otherwise including fuel surcharge

provisions in as many contracts as possible.  This allowed UP and BNSF to apply similar fuel surcharge percentages to freight transportation.  This change was a result of the conspiracy.

10.     At the same time, Defendant CSX, pursuant to the conspiracy, agreed to impose a percentage-based fuel surcharge as broadly as possible.  In mid-2003, CSX also announced that its fuel surcharge program would entail application of a fuel surcharge based on the monthly average of WTI Index prices in the second prior month, a method that had also been adopted by UP and BNSF for applying their programs using the HDF Index price.  Like BNSF and UP, CSX began including percentage-based fuel surcharges in as many contracts as possible.

11.     Pursuant to the conspiracy, NS also agreed during 2003 to impose a percentage-based fuel surcharge on contract traffic as broadly as possible.  NS made certain revisions to its fuel surcharge formula in early 2004, but could not immediately switch all contract traffic to its new program because NS had previously encoded its original fuel surcharge directly in some publications and contracts, which hampered its ability to rapidly change to the new fuel surcharge for all traffic.  Like CSX, NS utilized the WTI Index for its fuel surcharge program and implemented it as broadly as possible.

12.     In furtherance of the conspiracy, Defendants each applied the rail fuel surcharge the same way, namely, as a percentage multiplier of the total base rate for rail freight transportation.  That meant, for example, that if the applicable fuel index (*i.e.*, the HDF or the WTI) resulted in a 20% surcharge on the base rate, the "all-in" rate charged to the customer for the transportation would be increased by 20%, even though fuel accounted for just a portion of the total rail freight transport cost incurred by the railroad.  Defendants' agreement to adopt this approach resulted in their earning billions of dollars in additional profits.

13.     Because many shippers (including the Plaintiff utilities) purchased shipping by means of long-term contracts, the Defendant Railroads were stymied in immediately imposing their new fuel surcharge plan for shipments under those pre-existing multi-year contracts.  To address this set of circumstances, Defendants took a variety of steps.  Defendants required a fuel surcharge in new replacement contracts and dedicated themselves to this effort once the pre-existing contracts expired or were open to renegotiation.  Where possible, Defendants sought to incorporate fuel surcharge language in amendments to pre-existing contracts so that the supracompetitive profits could be secured before the expiration date of the pre-existing contracts.

14.     In order to facilitate implementation of these more uniform fuel surcharges, Defendants also changed the existing methodology often used for adjusting freight rates.  As of 2003, many rail freight transportation contracts incorporated rate adjustment provisions that included a variety of weighted cost factors, including fuel, based on an index called the All Inclusive Index ("AII") and a related index called the Rail Cost Adjustment Factor ("RCAF"), which were both published by the AAR, the railroad trade organization.  Some agreements did not rely on RCAF or AII for rate adjustment, but used other cost-based indexes that similarly encompassed fuel costs.  The AII, the RCAF, and the other cost-based indexes already permitted recovery by the Defendants of actual fuel cost increases, no matter how large.  A cost index (like the AII or RCAF) that accounted for increases in the cost of fuel hampered the Defendants' ability to justify the fuel surcharges that they implemented in their conspiracy.

15.     To address and overcome the existing freight rate adjustment formulas that already accounted for fuel costs, Defendants designed and commenced a scheme to remove fuel from the AII.  Defendants conspired to take collective action through the AAR that would facilitate modification of the rate adjustment provisions in their contracts with freight customers.

At AAR meetings in the Fall of 2003, Defendants conspired to cause the AAR to develop and publish a new rail cost index with fuel removed called the All Inclusive Index Less Fuel ("AIILF").  A senior officer of BNSF admitted in a 2005 letter that BNSF's Chairman, President, and CEO had compelled the AAR to adopt in 2003 the new index without fuel, something that had never been done before but would "tremendously help" the bottom line for years to come.  This collective action in December 2003 facilitated the Defendants' imposition of the new, separate, and artificially high rail fuel surcharges on their customers.

16.     Defendants maintained their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport base rate and further by agreeing upon similar trigger points for adjusting the percentages monthly.  Defendants also published their rail fuel surcharges on their websites to facilitate coordination and the exposure of any nonconformity with the uniform pricing scheme.  Defendants applied their fuel surcharge programs as widely as possible and sought to limit deviation from these programs.  Defendants also aimed to not undercut each other on fuel surcharge percentages, even though the surcharges far exceeded their actual increases in fuel costs.

17.     The Defendants also took other collective action to enforce the conspiracy and make it effective.  Each Defendant tracked its success towards 100% coverage.  Discipline within the conspiracy was maintained by the exchange of coverage data and regular inter-Defendant discussions concerning fuel surcharges and their uniform application.  When a Defendant's executives informed other Defendants' executives about the possibility of deviating from the scheme, they faced strong opposition.

18.     The Defendants also imposed similar fuel surcharges in their posted tariffs, which applied to regulated rates for transportation services that were not subject to specific customer

contracts.  In early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic (unlike the unregulated contract freight at issue here), found that Defendants' rail fuel surcharge programs were "unreasonable" because they were not tied to the railroads' actual cost of fuel.  The STB found that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs."  In particular, the STB determined that the Defendants were "imposing rate increases" through use of their so-called fuel surcharge programs.  The STB found this action was "a misleading and ultimately unreasonable practice," because "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied."  Rail Fuel Surcharges, STB Ex Parte No. 661 (served January 26, 2007), slip op. at pp. 6-7.  The STB's ruling applied only to rate-regulated freight traffic, but involved the same type of rail fuel surcharge programs imposed on rate-unregulated shipments.

19.     An independent 2007 study commissioned by the American Chemistry Council ("ACC") and Consumers United for Rail Equity ("CURE") found that the Defendants received over $6 billion more in rail fuel surcharge revenue (as publicly reported or estimated) than they spent in publicly-reported actual fuel costs during the period from 2003 through the first quarter of 2007.

20.     Defendants conspired and agreed to use the mechanism of a broadly imposed, percentage-based rail fuel surcharge, under the guise of recovering their actual fuel costs, as the means to raise rates across the board and reap billions of dollars in supracompetitive profits.  As a direct and proximate result of the illegal price-fixing conspiracy alleged herein, Defendants restrained competition in rate-unregulated rail freight transportation services in the United States, unreasonably restrained and affected interstate commerce, and injured Plaintiffs in their business

and property.  Plaintiffs paid higher prices for unregulated rail freight transportation than they

would have paid absent the concerted unlawful and anticompetitive activity alleged herein, and

continued to pay unlawfully high prices as a result of contracts entered into during the relevant

period.

## PARTIES

21.     Plaintiffs consist of (1) entities that purchased and/or contracted for rate-

unregulated rail freight transportation services directly from Defendants and paid rail fuel

surcharges in connection with those services, and (2) entities that are successors-in-interest or

assignees of such purchasers and/or contractors.

22.     APC is an Alabama corporation, with its principal place of business at 600 18th

Street North, Birmingham, AL 35203.  APC is a subsidiary of The Southern Company

("Southern"), serving 1.4 million homes, businesses, industries, and other customers in the

southern two-thirds of Alabama.

23.     GPC is a Georgia corporation, with its principal place of business at 241 Ralph

McGill Blvd. NE, Atlanta, GA 30308.  GPC is a subsidiary of Southern, and GPC operates as a

vertically integrated utility providing electric service to 2.5 million retail customers within its

traditional service territory located within the State of Georgia and to wholesale customers in the

Southeast.  Pursuant to a 2006 acquisition, GPC is the successor-in-interest to the Savannah

Electric and Power Company ("Savannah Electric"), which was a utility subsidiary of Southern

that previously operated in eastern Georgia.

24.     MPC is a Mississippi corporation with its principal place of business at 2992

West Beach Blvd., Gulfport, MS 39501.  MPC is a subsidiary of Southern and provides electric

service to most of the cities, towns, and communities within the 23 counties of southeastern

Mississippi.

25.     Defendant UP is a Utah corporation with its principal place of business at 1400 Douglas Street, Omaha, NE 68179.  UP is the largest Class I freight railroad in the United States and operates primarily in the central and western United States.  UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, DC 20005.

26.     Defendant NS is a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, VA 23510.  NS is a Class I freight railroad operating primarily in the eastern United States.  NS maintains a government relations office at One Constitution Ave., N.E., Suite 300, Washington, DC 20002.

27.     Defendant BNSF is a Delaware corporation with its principal place of business at 2650 Lou Menk Drive, Fort Worth, TX 76131.  BNSF is the second largest railroad in North America and operates 32,000 miles of railroad primarily in the central and western United States, as well as rail lines that extend into several southeastern states and the Canadian province of British Columbia.  BNSF maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, DC 20001.

28.     Defendant CSX is a Virginia corporation with its principal place of business at 500 Water Street, Jacksonville, FL 32202.  CSX is a Class I freight railroad operating primarily in the eastern United States and Canada.  CSX maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, DC 20004.

## JURISDICTION AND VENUE

29.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs because of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This Court has federal question jurisdiction over the subject matter of this action

pursuant to 15 U.S.C. § 4 (Sherman Act jurisdiction), 15 U.S.C. §§ 15 & 26 (Clayton Act

jurisdiction), 28 U.S.C. § 1331 (general federal question jurisdiction), and 28 U.S.C. § 1337

(antitrust jurisdiction).

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C.

§§ 15(a) and 22 because Defendants transacted business and/or had agents in this District during

the conspiracy and a substantial part of the events giving rise to the claim occurred in this

District.

31.    This Court has personal jurisdiction over the Defendants because they transact

business, maintain offices or are found within this judicial district, have substantial aggregate

contacts with this judicial district, and engaged in illegal conduct that was directed at and had the

intended effect of causing injury to Plaintiffs.  The wrongful conduct alleged in this Complaint

was carried out in part within this judicial district.

## INTERSTATE TRADE AND COMMERCE

32.    Throughout the conspiracy, there was a continuous and uninterrupted flow of

interstate trade and commerce throughout the United States in Defendants' sale of rail

transportation to shippers and customers throughout the United States.  Each Defendant used

instrumentalities of interstate commerce to sell, market, and provide rail freight transportation

services.  Defendants' unlawful activities have had a direct, substantial, and reasonably

foreseeable effect on interstate commerce.

## THE ILLEGAL CONSPIRACY

## PRE-CONSPIRACY PERIOD:  DEREGULATION AND CONSOLIDATION

33.    In 1980, Congress introduced competition into the rail transportation industry by

passing the Staggers Act, which significantly deregulated freight rail pricing.  Before the

Staggers Act, freight railroads generally charged published tariff rates filed with the ICC.  Rate

increases could be achieved by obtaining ICC approval for new tariffs, which implemented across-the-board rate changes on a collective basis for Defendants and other Class I railroads.

34.     The Staggers Act dramatically changed the competitive environment for United States railroads, which had been subject to regulatory control over nearly all aspects of their economic operations for decades.  After the Staggers Act, railroads could negotiate and set rates for rail transportation but could no longer apply to the ICC for across-the-board freight rate increases.  By 2000, at least 70% of all rail shipments were subject to private contracts that were not rate-regulated.

35.     Since the implementation of the Staggers Act, the number of Class I railroads has declined dramatically.  In 1980, there were approximately 35 railroads operating in the United States that were designated by the ICC as Class I railroads.  Subsequent to a period of consolidation after passage of the Staggers Act, there were, and still are, only seven Class I railroads.  The Class I railroads operating in the United States are:  (1) BNSF, (2) UP, (3) CSX, (4) NS, (5) Kansas City Southern Railway Company, (6) Soo Line Railroad Company, and (7) Grand Trunk Corporation.  Soo Line Railroad is owned by Canadian Pacific Railway, and Grand Trunk Corporation is owned by the Canadian National Railway.

36.     The railroad industry is highly concentrated.  Defendants BNSF, UP, CSX, and NS operate approximately 70% of all railroad track in the United States and in 2006 accounted for nearly $50 billion in total annual revenue.  Given the high fixed costs and the barriers to entry in the railroad industry, including, for example, the need to obtain locomotives and other equipment, acquire property rights, develop a network of tracks, yards, and facilities, as well as substantial regulatory and environmental burdens, there is only a fringe or niche market of small carriers and the competition offered by these small carriers is negligible.

37.     While the goal of railroad industry deregulation, namely to introduce competitive forces, may have been fulfilled for some period leading to the early 2000s, railroad consolidation and other factors created a situation that was highly susceptible to collusion.

## DEFENDANTS AGREE TO INTRODUCE FUEL SURCHARGES
## AND FIX SHIPPING PRICES

38.     Competition in the railroad industry resulted in declining pricing through the early 2000s, and the Defendants were frustrated by their inability to raise prices in this environment. As one BNSF executive commented in 2002:  "We need to be able to achieve rate improvement. How can we do this if the other competing railroads do not do this at the same time?"

39.     By the early 2000s, industry consolidation made additional mergers unlikely, if not impossible.  In response to the proposed merger of the Burlington Northern and Santa Fe Railway and Canadian National Railway in 2000, the STB announced a moratorium on new mergers and promulgated more stringent standards for merger review.

40.     Because of deregulation, Defendants lacked legal means to implement across-the-board price increases.  Increased rates also could not be pursued through further consolidation in light of the STB's more stringent review of rail mergers.  Consequently, the only feasible way that railroads could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible.  Under the guise of a solution to rising fuel costs, the Defendants colluded to create and jointly impose percentage-based rail fuel surcharges as a means to achieve what effectively were across-the-board rate increases.

41.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included rate adjustment provisions often tied to the AII and the RCAF (which is based on the AII) or to another cost-based index that included fuel costs.  Both the RCAF and the AII were published by the AAR, and both indexes included fuel

costs as a factor.  The AII and RCAF weighted a number of cost factors – labor, fuel, materials

and supplies, equipment rents, depreciation, interest, and other expenses – so that the actual

impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index.  Any actual

increase in fuel costs, no matter how large, would be captured in the AII and RCAF.  The

indexes, and the weighted factors within them, were designed for this purpose.

42.     Prior to 2003, at least some of the Defendants attempted to impose fuel surcharges

on rail freight transportation.  But Defendants' efforts to impose fuel surcharges were isolated

and inconsistent, with differing surcharge methods that reflected differing fuel costs and different

formulas for incorporating them as a rate surcharge.  Defendants did not uniformly or

consistently include their fuel surcharges in contracts and, even when included, the fuel

surcharges were not necessarily triggered by fuel prices or enforced when triggered.

43.     In 2003, Defendants conspired and agreed to use fuel surcharges as the means to

create an across-the-board rate increase.  From at least the spring of 2003 through approximately

2008, Defendants adopted and implemented rail fuel surcharges through a series of coordinated

actions using common organization.  To do so, the top executives of Defendants communicated

frequently and met regularly at restaurants and recreational and conference facilities, at AAR

board meetings in Washington, D.C., and at biannual meetings of the National Freight

Transportation Association ("NFTA").

44.     In April 2003, the NFTA meeting occurred at the Wigwam resort in Litchfield

Park, Arizona.  Within months of the April 2003 NFTA meeting, BNSF and UP suddenly began

coordinating their rail fuel surcharges.  Previously, UP's fuel surcharge was adjusted monthly

based on the WTI Index, while BNSF's fuel surcharge was based on the HDF Index.  However,

in or about June or July of 2003, pursuant to its agreement with BNSF, UP switched to the HDF

Index.  From that point forward, BNSF and UP's fuel surcharge programs resulted in application of similar percentages, and both utilized a monthly percentage-based fuel surcharge based on the HDF Index.

45.     BNSF and UP conspired and agreed to use the HDF Index and apply a substantial percentage-based fuel surcharge to their rail transportation contracts as widely and uniformly as possible.  BNSF and UP also agreed to apply the HDF Index in the same way.  If the HDF Index reported the average monthly price of diesel fuel at or above a certain per gallon "trigger price" level, such as $1.35 per gallon, BNSF and UP each would apply a percentage-based surcharge in similar increments above the trigger price.

46.     BNSF and UP also coordinated the timing of their rail fuel surcharges.  They agreed to adjust the rail fuel surcharge for shipments made in the second month after the month in which there was a change in the HDF Index average price.  So, for example, the HDF Index average price in January would determine the new rail fuel surcharge percentage announced by BNSF and UP on February 1, and this percentage would apply to shipments in March.  BNSF and UP published their fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.  Pursuant to their agreement with CSX and NS, BNSF and UP also sought to apply their fuel surcharges as widely as possible.

47.     BNSF and UP simultaneously selected and adopted the same novel, arbitrary, and complex combination of features for their rail fuel surcharge programs, including the same index and similar trigger points, as well as the same timing for announcement and application of changes in the HDF Index.  The similarities are too precise and comprehensive to have been independent responses to a common market phenomenon, especially considering BNSF and UP had differing rate and cost structures, customer bases, fuel sources, and fuel costs.

48.     As further evidence of concerted conduct, in April 2003, just two months before moving to the same fuel price index as BNSF, UP announced a modification to its existing fuel surcharge formula:  it changed the trigger points used for adjusting surcharges and began relying on a monthly average of WTI prices, but UP did not change the WTI index used to monitor fuel costs.  Two months later, UP switched to the HDF Index and started imposing fuel surcharges under a program very similar to that of BNSF.

49.     At same time that UP and BNSF began to coordinate their fuel surcharges and began pushing to impose them as broadly and uniformly as they could, Defendant CSX, pursuant to the conspiracy, also announced that it would begin applying its fuel surcharge based on the monthly average of WTI Index prices in the second prior month, a method that had also been adopted by UP and BNSF, though using the HDF Index price.  The similarities are too precise and comprehensive to have been independent responses to a common market phenomenon, especially considering the Defendant Railroads had differing rate and cost structures, customer bases, fuel sources, and fuel costs.

50.     Pursuant to the conspiracy, NS also agreed during 2003 to impose a percentage-based fuel surcharge on contract traffic as broadly as possible.  NS made certain revisions to its fuel surcharge formula in early 2004, but could not immediately switch all contract traffic to the revised formula because NS had previously encoded its original fuel surcharge directly in certain publications and contracts – rather than simply citing to its published fuel surcharge formula – which hampered its ability to rapidly change to its revised formula.  Like CSX, NS used the WTI Index for its program, with triggering prices that were analogous to those utilized by CSX, BNSF, and UP.  NS further realized that it would be much easier in the future to modify the fuel

surcharge program applicable to contract traffic if the contracts simply referenced the NS fuel surcharge tariff.

51.     As a result, CSX and NS each implemented the Defendants' prior agreement by applying a substantial percentage-based fuel surcharge to their rail transportation contracts as widely as possible.  For many shipments, CSX and NS utilized functionally similar WTI trigger prices.  As the WTI price increased from the trigger prices, CSX's and NS's rates would be adjusted upward by substantially similar percentage amounts.  These concerted changes were part of, and flowed from, the aforementioned agreements reached and implemented by Defendants in late 2003.

52.     For many shipments, CSX and NS also coordinated the timing for adjustments to their rail fuel surcharges.  For these shipments, they adopted the same timing as BNSF and UP, *i.e.*, two calendar months after any adjustment to the applicable fuel (HDF) or oil (WTI) index.  Thus, for example, if the WTI average price exceeded the triggering level in January, CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could coordinate application of the relevant fuel surcharge percentage month after month.  Like BNSF and UP, CSX and NS published their fuel surcharge percentages on their websites to enable the other railroads to detect any deviation from the agreed pricing and enforce the agreement.   Defendants generally applied rail fuel surcharges as a separate item on shippers' bills.  Fuel surcharges were not only included in contracts that contained cost adjustment clauses based on the new AIILF index, but they were also incorporated into contracts that continued to utilize the RCAF cost adjustment factor.  In either circumstance, Defendants used monthly changes to their rail fuel surcharges as an easy way to increase revenues in an across-the-board manner.

53.     All Defendants agreed to implement percentage-based fuel surcharges as broadly
as possible, based on the reported price in a public fuel (HDF) or oil (WTI) index, rather than on
their actual fuel costs.  For many shipments, NS and CSX went even further: they selected and
adopted the same novel, arbitrary, and complex combination of features for their rail fuel
surcharge programs – features that were also utilized by BNSF and UP.  For these shipments, NS
and CSX utilized the same WTI Index for fuel surcharges, assessed a percentage-based fuel
surcharge to transportation rates based on the monthly average WTI Index level, and applied the
surcharge in the second calendar month after the monthly WTI Index figure was determined.
Defendants' contemporaneous adoption of similar fuel surcharge programs reflected their
coordination and agreement to implement percentage-based fuel surcharges.  The similarities,
and the coordination among the railroads, are too precise and comprehensive to have been
independent responses to a common market phenomenon or conditions.

54.     While Defendants suggested that their rail fuel surcharges were imposed to
account for unanticipated increases in fuel prices, they were in reality merely coordinated price
increases.  NS documents filed in *In re Rail Freight Fuel Surcharge Antitrust Litigation* reflect
that the fuel-based surcharges were a "blatant general rate increase" on customers.  An internal
NS e-mail, dated April 29, 2003, includes the following statement:

- **By dropping the base to $23 per barrel, raising the percentage yield and talking it sooner, the change is in fact a blatant general rate increase, and will appear so to customers.**

(*See In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, attached to
Doc. 705-17, NS 001000012, filed Feb. 10, 2014.)

55.     Defendants' rail fuel surcharges bore no direct relationship to Defendants' actual
increases in fuel costs.  The AII and RCAF both included a fuel cost component and would have

permitted Defendants to recover all their increased fuel costs throughout the conspiracy.  By

removing fuel costs from the newly applicable index (the AIILF) and adding a pretextual "fuel

surcharge" formula applied to the entire base rate, Defendants were able to drive revenue

increases far out of proportion to any actual increases in fuel costs.  Thus, there was no

legitimate business justification or other innocent explanation for the collective action of the

Defendants to cause the AAR to adopt and publish the AIILF.

56.     Defendants also used the fuel surcharge and the AIILF as a means to raise prices

by "re-basing," whereby rail transportation base rates were raised along with the trigger price for

imposition of fuel surcharges.  When shippers complained that, for example, a trigger of $23 or

$28 per barrel for WTI was leading to unfairly high surcharge recoveries as oil prices rose, the

railroads sometimes offered to increase the trigger price to, for example, $90 per barrel, but

insisted that the base rate be adjusted upward so that the all-in charges would remain the same as

they were at the lower trigger price.  While this had the appearance of reducing the application of

fuel surcharges (because they would only be applied when the applicable fuel cost index reached

the new, higher trigger price), in reality Defendants were able to incorporate supracompetitive

prices previously obtained through fuel surcharges in the higher base rates.  In other words, the

higher base rates were premised on Defendants' unlawfully imposed fuel surcharges and

therefore generated higher revenues attributable to Defendants' conspiracy.

57.     Because of the Defendants' concerted action, prices of rail freight transport were

increased above competitive levels, and freight shippers including Plaintiffs were forced to pay

artificially and unlawfully high prices for Defendants' services.

**DEFENDANTS COLLECTIVELY CHANGE AII TO REMOVE FUEL**

58.     Even after agreeing to coordinate their fuel surcharges, Defendants faced an

obstacle to the imposition of fuel surcharges.  Many contracts contained rate adjustment

provisions that already accounted for railroads' fuel costs by incorporating the RCAF or another

cost-based index that included changes in fuel costs.  The Defendants agreed to solve this

problem by conspiring to remove fuel from the most widely utilized rate adjustment index,

thereby creating a new rail cost index without fuel known as the AIILF.

59.     In furtherance of the previously-agreed conspiracy, Defendants initiated an effort

in the AAR in the fall of 2003 to remove fuel costs from the weighted RCAF and AII (which

already allowed Defendants to recover all their fuel costs), and thereby facilitate use of

artificially high rail fuel surcharges as a revenue enhancement mechanism.  The "surcharge"

would be implemented as a percentage increase on the total rate for freight transport, regardless

of the actual cost of fuel.  At AAR meetings and discussions in late 2003, Defendants agreed to

create and implement the AIILF, a new rail cost index that omitted fuel.

60.     The AAR is (and was at all relevant times) based in Washington, D.C., and

describes itself as "the world's leading railroad policy, research, standard setting, and technology

organization that focuses on the safety and productivity of the U.S. rail freight industry."  CSX

describes the AAR as "the central coordinating and research agency of the North American rail

industry."  The AAR is (and was at all relevant times) controlled by Defendants.  The AAR

Board, of which Defendants' CEOs are all members, meets regularly in Washington, D.C., and

board members communicate regularly between meetings.

61.     Through their combination and conspiracy, Defendants caused the AAR to

announce the creation of the AIILF in December 2003.  The AAR's official publication of the

"AAR Railroad Cost Indexes" in March 2004 stated:  "In this publication, the AAR also

calculates a version of the All-Inclusive Index that does not include fuel.  This All-Inclusive

Index Less Fuel (AII-LF) is calculated exactly the same, with matching component indexes, as

the All-Inclusive Index used with the RCAF – with the exception of the exclusion of the fuel component." The new AIILF specified the fourth quarter of 2002 as its base period. The announcement of the AIILF and the underlying decision to create the new index were the result of collective action by the Defendants, and neither could have happened without the conspiracy.

62.     Defendants conspired to cause the AAR to inaugurate the AIILF in order to facilitate the use of separate, stand-alone rail fuel surcharges, applied against the total rate charged for rail freight transportation, and coordinated that practice. The creation of this new index was an important, carefully planned step taken collectively by Defendants to foster and continue their previously-agreed price-fixing conspiracy, a conspiracy that involved Defendants imposing price increases on the entire rate for rail freight transport and thereby obtaining additional revenues far beyond any actual increases in fuel costs.

63.     The creation of the AIILF was a notable departure from past practice and marked the first time that the AAR created a rail cost index without a fuel cost component. The new index was not the result of a general change in assessing railroad industry cost factors, as the STB-published RCAF continued to contain a fuel cost component. The reason for creation of the AIILF was to enable Defendants to raise shipping prices and to implement their price-fixing conspiracy by imposing percentage-based price increases on the entire rate for rail freight transport. Defendants collectively decided to switch to a percentage-based fuel surcharge not because it better tracked their costs than prior indexes, but because it did not.

64.     BNSF admitted that it worked through the AAR to establish the new AIILF index during a second quarter earnings conference call in July 2004. BNSF's Chief Marketing Officer, responding to a question about how BNSF could apply the new percentage-based fuel surcharges in contracts with coal shippers, said it could do so because of the changes to the applicable

indexes published by the AAR. Referring to BNSF's Chairman, President, and CEO, the Chief Marketing Officer stated, "What happened last year, and [BNSF] led the charge on this, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

65. The Defendants' collective action in December 2003 helped them impose a new, separate, and artificially high rail fuel surcharge on their customers, which they could claim was justified because fuel was no longer automatically covered by standard rate adjustment clauses. As UP's President and CEO admitted during an October 2004 earnings call, UP got "away from the RCAF" and was "putting in the specified fuel recovery mechanism in areas that historically would have used RCAF."

## DEFENDANTS IMPLEMENT THE FUEL SURCHARGE SCHEME

66. Defendants' agreement in 2003 to implement as broadly as they could a separate rail fuel surcharge as a multiplier percentage of the base rate and remove fuel as a part of cost adjustments in contracts was successfully implemented through Defendants' collective action. This meant that the fuel surcharge could operate as a means to impose an effective rate increase and thereby raise revenues far beyond the actual costs of fuel (which could have been recovered through cost indexes that tracked actual fuel prices). Defendants applied the rail freight surcharges to published tariff rates, as well as private contracts and other traffic not subject to rate regulation.

67. Defendants recognized the need for uniformity and collective action to implement and maintain their rail fuel surcharge scheme. Evidence of their desire to implement and enforce the scheme on a uniform basis exists in documents that have been made public. For example, in a January 2004 e-mail, UP stated:

The Highway Diesel Fuel surcharge policy is required for any new and renewed contracts within Industrial Products. ANY deviation from that policy requires advance sign-off by Bob Toy. Have heard some rumors recently that people have been trying to "game" the system. Not a good idea.

(*See In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, attached to Doc. 705-30, UPFSC 0276597, filed Feb. 10, 2014.)  Similarly, the minutes of a May 2003 meeting of the "NS-UP Alliance" make clear that Defendants intended to, and did, agree to act collectively:

**Attendees:**
UP - Dick Davidson, Ike Evans, Dennis Duffy, Jack Koraleski, Brad King, Jim Young, Merill Bryan, John Gray, Woody Sutton, Jeff Koch

NS - David Goode, Ike Prillaman, Jim McClellan, Don Seale, Steve Renken, Wick Moorman, Tony Ingram, Mark Manion, Mike McClellan

automotive business going forward. Discussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis. **Follow up: UP - Jack Koraleski/Mike Hemmer, NS – Don Seale/Greg Summy**

(*See In re Rail Freight Fuel Surcharge Antitrust Litigation,* MDL Docket No. 1869, attached to Document 705-63, NS 001000361, filed Feb. 10, 2014.)

68.     Defendants succeeded in implementing uniform fuel surcharges as a result of their efforts.  In furtherance of the conspiracy, BNSF and UP, using the HDF Index, charged substantially identical rail fuel surcharges beginning in July 2003.  CSX and NS also acted in furtherance of the conspiracy by using the WTI Index to charge substantially similar rail fuel surcharges, in a broad and coordinated fashion, starting in 2003.  All four Defendants agreed to implement percentage-based fuel surcharges as broadly as possible in the same general manner –

as a percentage-based addition to the base transportation rate after triggering by the applicable fuel (HDF) or oil (WTI) index.

69.     Defendants incur differing fuel costs as a percentage of operating cost and have differing fuel efficiency in the operation of their trains.  Defendants' use of matching fuel cost indexes and contemporaneous implementation of their rail fuel surcharges indicates that they were coordinating their behavior and conspired to fix prices for rail fuel surcharges.  In addition, Defendants' announcements in advance of their surcharges, and the posting of surcharge information on their websites, were important mechanisms for implementation and enforcement of the conspiracy.

70.     Defendants' price increases were far higher than what could have been justified by increases in what they actually paid for fuel.  BNSF's average cost of diesel fuel in Q3 2003 was $0.846 per gallon, and its average cost of diesel fuel for Q3 2004 was $0.988 per gallon.  Thus, BNSF's cost of fuel increased 16.8% from Q3 2003 to Q3 2004.  By contrast, the standard BNSF fuel surcharge was based on an HDF level of $1.46 per gallon (far higher than what BNSF was actually paying) in Q3 2003 and $1.83 per gallon in Q3 2004, a 25.3% increase.  While BNSF's cost of fuel increased only 16.8% from Q3 2003 to Q3 2004, the HDF index (on which the BNSF fuel surcharge was based) increased over 25% in the same time period.  As a result of this disparity, rail customers were paying a fuel surcharge based on an index fuel price that rose far faster than the increase in BNSF's actual fuel costs.  Shippers similarly overpaid the other Defendants during this and other periods, particularly because the inflated percentage increase was applied to the entire rate at issue, not merely the fuel cost component of that rate.

71.     The fuel surcharge levels also disregarded gains in fuel efficiency, another indication that the rail fuel surcharges were not a natural reaction to increased fuel costs.  As an

AAR publication explained in 2007, Defendants' fuel efficiency is "constantly improving." For example, BNSF announced in 2005 that it achieved a 9% improvement in fuel efficiency over the prior decade. In 2006, railroads could move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, Defendants deflected attention from the cost savings they had achieved through efficiency gains.

72.     Defendants' actions were contrary to each of their respective independent economic self-interest. Both fuel efficiency and actual fuel cost as a percentage of operating cost differ widely among railroads and different rail routes and movements. In a competitive environment, carriers with lower fuel costs would negotiate regarding application of fuel cost adjustments in an effort to increase market share and revenues. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and broadly applied similar percentage-based fuel surcharges to the total rate for transportation. Starting around 2003, Defendants generally refused to negotiate applicability of their rail fuel surcharge programs, even when doing so would have allowed them to capture additional business, revenue, and market share. Defendants' conspiracy to decouple fuel costs from the existing railroad cost indexes (such as RCAF and AII) was a method of achieving uniform pricing and avoiding competition. Through their collective action, Defendants could use the stand-alone rail fuel surcharge as an easy way to dramatically increase profits, so long as Defendants complied by not competing on rail fuel surcharge prices or otherwise undercutting one another.

73.     Defendants' discussions, communications, and meetings relating to fuel surcharges, either directly or by and through the AAR or NFTA, did not concern the interline movement of a rail carrier with one or more other rail carriers but were instead concerned with

securing agreement upon, and adherence to, an unlawful scheme to eliminate price competition.

The discussions, communications, and meetings were conducted for the purpose of reaching

agreement on a uniform fuel surcharge methodology, divorced from fuel costs actually incurred

for any given rail movement, to which each Defendant's adherence could be readily monitored

and whose application was independent of interline movements of any Defendant with another

Defendant.  The foregoing conduct had nothing to do with facilitating interline movement of

traffic or acting together with respect to an interline rate or related matter but was, instead,

intended to eliminate price competition on all movement of traffic.

74.     Railroad industry analysts and experts expressed concerns about the

"convergence" in Defendants' rail fuel surcharge methodologies.  One analyst concluded in 2003

that the rail fuel surcharges were "not supported" by fuel cost increases and said that she was

"puzzled by the fact that the railroads appear to be matching fuel surcharges rather than

developing their own pricing initiatives" as a "way to gain significant market share."

("Following the Competition," *Traffic World*, July 14, 2003.)  An independent 2007 study

commissioned by ACC and CURE found that Defendants' rail fuel surcharge revenue exceeded

their publicly reported actual fuel costs between 2003 and early 2007 by over $6 billion.  A 2010

joint report by the United States Departments of Agriculture and Transportation, titled "Study of

Rural Transportation Issues," similarly found:  "There is considerable evidence that railroad fuel

surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits.

From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of

fuel."

75.     Defendants' coordinated implementation of fuel surcharges could not have been a

coincidence, and was not a rational response to business conditions that were affecting each

railroad equally.  Defendants' purpose was to use recovery of fuel costs as a cover for implementing what were, effectively, across-the-board rate increases.

76.     The wide-spread imposition of the fuel charge mechanism was a change from past industry practice.  The President and CEO of UP stated in a July 2007 interview that the new rail fuel surcharges as applied to rail freight were "really unique to the railroad industry.  Three, four years ago they were really non-existent."

77.     At or about the time Defendants agreed to impose rail fuel surcharges, they also took other steps in furtherance of the conspiracy.  For example, Defendants typically declined to negotiate either the application of the fuel surcharges or significant discounts from the fuel surcharges.  Plaintiffs, as well as shippers from many different industries, including some with substantial economic power, tried to negotiate the applicability of the fuel surcharge, but Defendants took the position that rail fuel surcharges must apply.

78.     Defendants also agreed not to use their increased revenues and profits to subsidize the discounting of underlying rates to undercut agreed pricing or "steal" market share from each other.  As a result, Defendants' relative market shares remained stable after the 2003 agreements.

**STB FINDS RAIL FUEL SURCHARGES UNREASONABLE**

79.     On January 25, 2007, the STB issued an administrative decision concluding that the Defendants' practice of computing rail fuel surcharges as a percentage of base rates for rate-regulated rail freight transport was an "unreasonable practice" because such fuel surcharges were not tied to the fuel consumption associated with the individual movements to which they were applied.

80.     The STB found that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs . . . [The railroads' fuel surcharge program was] a misleading and ultimately unreasonable practice,"

because "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied." Rail Fuel Surcharges, STB Ex Parte No. 661 (served January 26, 2007), slip op. at p. 6-7. Although the STB was considering only rate-regulated freight traffic which is not at issue here, the STB's findings and opinion support Plaintiffs' allegations.

81.     In furtherance of the conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case. The fuel surcharges the railroads had imposed in their tariffs for rate-regulated traffic were substantially similar, if not identical, to those they were foisting on their customers who were moving freight under rate-unregulated arrangements.

## DEFENDANTS' SUPRACOMPETITIVE PROFITS

82.     As a result of the success of their conspiracy, Defendants reaped huge, supracompetitive profits. They realized billions of dollars in revenue in excess of their actual increases in fuel costs from the specific customers on whom they imposed the surcharge. From July 2003 until the end of 2008, Defendants increased their market capitalization from approximately $40 billion to approximately $71 billion, a 78% increase. During the same period, the S&P 500, a broad-based stock index, declined by approximately eight percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to more than $52 billion in 2006 and approximately $61 billion in 2008. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price-fixing conspiracy. As the President and CEO of UP admitted in 2007, "it's only been in the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

83.     The unlawful conduct, combination, or conspiracy alleged herein has had the following effects, among others:

    (a) The rail fuel surcharges charged to Plaintiffs have raised, fixed, or stabilized prices and resulted in supracompetitive prices for unregulated rail freight transportation;

    (b) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in unregulated rail freight transportation; and

    (c) Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

## ANTITRUST INJURY – IMPACT ON PLAINTIFFS

84.     During all relevant times addressed herein, Plaintiffs operated multiple coal-fired steam-generating electric power plants and sourced coal from mines throughout the United States.  Many power plants were further divided into separate operating units, and individual operating units sometimes had different characteristics.  Coal for steam generation was transported on unit trains, often with more than 100 cars, in most cases without any substitution or unloading of cars between the mine and the plant.  There were often no economically feasible alternatives to rail transportation of coal.  Because of the volume of coal consumed at each plant and the overland distance between a plant and the mine or mines from which coal was sourced, other means of transportation were grossly inefficient, prohibitively expensive, or otherwise foreclosed.  Plaintiffs had no economic alternative but to purchase rate-unregulated rail transportation services from Defendants for delivery of coal to their plants, and rail transportation of coal pursuant to private contracts is a relevant service market.

85.     Railroads have historically derived more revenue from the shipment of coal than from any other single commodity.  In 2008, for example, gross revenue from coal exceeded $14 billion for Class I railroads, and coal accounted for more than 24% of the total revenue of the five largest railroads.[2]

86.     Plaintiffs purchased different types of coal, depending upon design features, emission controls, and other relevant equipment at the operating units within a given plant. Plaintiffs needed to obtain the appropriate coal, with the correct specifications, to correlate with the particular characteristics of the destination coal-burning units.  Some units were restricted to burning only lower sulfur coal, while other units may have been able to burn coal with a higher sulfur content.  Other coal specifications were also critical, including BTU rating, ash content, moisture, and various metals, minerals, and other trace elements.  Plaintiffs sourced coal for each plant from multiple mines, and they typically entered into long-term supply contracts with mine operators to ensure the uninterrupted flow of coal with the characteristics appropriate to each plant.  Plaintiffs purchased low-sulfur, high-BTU coal from mines in Colorado and Utah, low-sulfur, low-BTU coal from the Powder River Basin (in Wyoming and Montana), and comparatively high-sulfur, high-BTU coal from mines east of the Mississippi River, including those in the Illinois Basin, Alabama, Kentucky, Virginia, West Virginia, and other states.  The contiguous 48 states constitute the geographic market within which Plaintiffs could turn for the purchase of services for transportation of coal by unit trains from mines to their plants.[3]

---

[2] Ass'n of American Railroads, "Railroads and Coal," at 7 (June 2017), *available at* https://www.aar.org.

[3] Infrequently, Plaintiffs purchased import coal that was transported by Defendants from one or more port areas.

87.     Defendants' violations of Section 1 of the Sherman Act have unlawfully restrained trade in the market for transportation of coal by unit trains to coal-fired power plants in the foregoing geographic market and have injured Plaintiffs in their business and property. Plaintiffs have paid for rail freight transportation at prices above what would have been charged in a competitive market as a result of Defendants' illegal contract, combination, or conspiracy to restrain trade as alleged in detail herein.  This is an antitrust injury of the type that the federal antitrust laws were meant to punish and prevent.

88.     APC was a party to numerous rail transportation agreements with Defendants by and after 2003 (such as contracts with BNSF, NS, and CSX), and these agreements included the unlawful percentage-based fuel surcharges described herein.  The percentage-based fuel surcharges were imposed by Defendants in these agreements as a result of, and in furtherance of, Defendants' conspiracy, and injured APC.

89.     GPC was a party to numerous rail transportation agreements with Defendants in and after 2003 (such as contracts with NS, CSX, and UP), both in its own name and as the successor-in-interest to Savannah Electric, as well as the contracting agent for and/or assignee of co-owners of Plants Scherer and Wansley, and these agreements included the unlawful percentage-based fuel surcharges described herein.  The percentage-based fuel surcharges were imposed by Defendants in these agreements as a result of, and in furtherance of, Defendants' conspiracy, and injured GPC and the co-owners.

90.     MPC was a party to numerous rail transportation agreements with Defendants in and after 2003 (such as contracts with UP and BNSF), and these agreements included the unlawful percentage-based fuel surcharges described herein.  The percentage-based fuel

surcharges were imposed by Defendants in these agreements as a result of, and in furtherance of, Defendants' conspiracy, and injured MPC.

## COUNT I
## ILLEGAL CONSPIRACY IN RESTRAINT OF TRADE

91.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

92.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

93.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for rail fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade in the market for the rail transportation of coal from mines to coal-fired steam generating electric power plants in the 48 contiguous states.

94.     Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate commerce.  Defendants' unlawful conduct was through mutual understandings or agreements, by, between, and among Defendants.

95.     The contract, combination, or conspiracy has had the following effects:

(a) Prices charged to Plaintiffs for rate-unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels as a result of rail fuel surcharges applied as a percentage of base rates;

(b) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

(c) Competition establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

96.     As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supracompetitive prices for rate-unregulated rail freight transportation services.

WHEREFORE, Plaintiffs pray for relief as follows:

1)     That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

2)     That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs;

3)     That each of Defendants and their respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

4)     That Plaintiffs recover treble damages, as provided by law;

5)     That Plaintiffs recover their costs of the suit, including attorneys' fees and interest, as provided by law; and

6)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by jury.


Dated: October 2, 2019                     **THOMPSON HINE LLP**

By:    /s/   Sandra L. Brown
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
Daniel Ferrel McInnis (D.C. Bar No. 452452)
David E. Benz (D.C. Bar No. 485868)
Joseph A. Smith (D.C. Bar No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W., Suite 700
Washington, D.C. 20036
Telephone: (202) 331-8800
Facsimile: (202) 331-8330
sandra.brown@thompsonhine.com

Robert F. Ware (*pro hac vice* motion to be filed)
Jennifer S. Roach (*pro hac vice* motion to be filed)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: (216) 566-5500
Facsimile: (216) 566-5800